**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Urban Commons 2 West LLC, Urban Commons 2 West II LLC, and Urban Commons 2 West III LLC, <br><br>         Petitioner, <br><br>    v. <br><br> New York Hotel & Motel Trades Council, AFL-CIO, <br><br>         Respondent. | Civil Action No. 1:21-cv-04842 |

## MEMORANDUM OF LAW IN SUPPORT OF PETITION AND MOTION TO VACATE THE ARBITRATION AWARD

For as long as anyone can remember, collective bargaining agreements have only ever applied to employers and employees. Collective bargaining agreements, like the agreement here, describe the rights and duties of employers and employees in relation to each other. In New York City, the hotel industry is bound by the Industry Wide Collective Bargaining Agreement ("IWA"). And whenever an IWA-bound hotel is sold to a new owner, or a new manager is retained to operate the hotel, the new owner or operator must sign an assumption agreement to be bound by the IWA—that is a condition of sale to a new owner or retention of a new operator. The provision requiring new owners and operators to join the IWA, Article 59, plainly provides that it applies to "employers," a defined term, and "transactions" in which the new entity assumes "majority ownership, management, or operational control" of the hotel.

In an unprecedented decision on a question of first impression, the arbitrator under the IWA (the "Impartial Chairperson") disregarded the plain text of Article 59 to require that *lenders* agree to join the IWA when they provide financing to a hotel. This decision contradicts the text of the IWA, and there is no sensible explanation for how a lender fits into the definition of an "employer," nor is there any way to reconcile the role of a lender with Article

59's requirement that only those with "majority ownership, management, or operational control" must join the IWA. Both the text of the lending agreements here and well-settled law in New York recognize that mortgage lenders do not own or operate the mortgaged property.

The Impartial Chairperson's decision carries with it enormous consequences for the city's hotel industry. Never before has the IWA been interpreted to require a lender to join an industry-wide collective bargaining agreement based solely on its financing arrangement with a borrower. But now, hotels will be forced to pay monetary fines for a situation they are powerless to cure because they have no authority to force lenders to join the IWA. This leaves hotels with no choice but to either pay the Union not to file a grievance or pay the lender to join the IWA. And new loans may be difficult or impossible to obtain, given lenders' understandable reluctance to shoulder the obligations of the IWA when lending to hotels. With hotels already cratering under the financial pressure from COVID-19, the Impartial Chairperson's decision to disregard the plain text of the IWA comes at a time when the hotel industry can least afford it. Already, two hundred of the city's seven hundred hotels are shuttered—some permanently—and the industry is bleeding money by the day. The Impartial Chairperson's decision disregards the plain language of the IWA, complicates financing across the entire industry, and should be vacated without delay.

<u>**Background**</u>

The Wagner at the Battery ("Hotel") is an independent hotel located in the southern tip of Manhattan, across from Wagner Park. In 2018, the Hotel changed ownership when it was bought by Urban Commons 2 West LLC, Urban Commons 2 West II LLC, and Urban Commons 2 West III LLC (collectively, "Urban Commons" or "Petitioner"). When it acquired ownership of the Hotel, Urban Commons executed an assumption agreement to be bound by the Industry Wide Agreement ("IWA"), which is the master contract between the New York Hotel and Motel Trades Council, AFL-CIO ("Union") and the Hotel Association of New York City, Inc. ("Association"). Grossman Decl., Ex. 4.

Urban Commons also entered into a mortgage agreement ("Mortgage Agreement") with BPC Lender, LLC ("Lender"). As is typical, Urban Commons received a loan and the Lender received a lien on the Hotel to secure Urban Commons' obligation to repay the loan. Absent an "Event of Default," the Lender is unable to exercise the "Remedies" provision of Section 7.1 of the Mortgage Agreement and so cannot "exercise all rights and powers of [Urban Commons]" or "use, operate, manage, control, insure maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business." Grossman Decl., Ex. 6. In other words, provided Urban Commons fulfills its obligations, the Lender is unable to exercise any managerial or operational control of the Hotel.

Urban Commons also retained Highgate Hotels, LP ("Highgate") to operate the Hotel, and Highgate also executed an assumption agreement to be bound by the terms of the IWA and retain all bargaining unit employees. *See* Grossman Decl., Ex. 1. Urban Commons, Highgate, and Lender entered into a Subordination, Assignment, Nondisturbance and Attornment Agreement ("SNDA")—effectively giving Lender a lien on Urban Commons' and Highgate's rights in the Hotel if Urban Commons defaulted on its loan obligations. Grossman Decl., Ex. 7.

It is undisputed that the Lender has not revoked the Owner's License under Section 2.4 of the SNDA, declared any "Event of Default" under Section 7 of the Mortgage Agreement, commenced a foreclosure action, or assumed any of Urban Commons' rights or obligations in any respect whatsoever. It is also undisputed that Lender is completely unaffiliated with either Urban Commons or Highgate other than the loan. It is not related to, affiliated with, a successor to, or an assignee of either Urban Commons or Highgate.

Several provisions of the IWA are relevant here. For one, the preamble to the IWA defines "EMPLOYER" as: "each and every such hotel, motel, and concessionaire, including their owners, managers, operators, respective affiliated and related entities, successors and

assigns." Grossman Decl., Ex. 4, at 15.[1] The definition of "employer" does not include lenders or mortgagees.

Also relevant is Article 59, entitled "Successors and Assigns." Article 59(B) provides: "EMPLOYER shall make it a written material condition of any transaction of any kind whatsoever which transfers majority ownership, management, or operational control of the Hotel or Concessionarie such that the party ("transferee") assuming such majority ownership, management, or operational control must assume and be bound in writing to this Agreement."[2] Grossman Decl., Ex. 4, at 61.

In the fall of 2020, the Union initiated an arbitration proceeding, demanding a determination from the Impartial Chairperson ("IC") that Urban Commons and Highgate violated Article 59 of the IWA by not requiring the Lender to execute an assumption agreement of the IWA. It also sought damages. Grossman Decl., Ex. 1, at 3.

The IC issued its award of March 10, 2021, largely accepting the Union's arguments. Despite recognizing that "the Lender's interest is no more than a security interest currently," the IC concluded that the Lender's non-assumption of the IWA was "a technical violation of the IWA." Grossman Decl., Ex. 1, at 24. In a thinly reasoned decision, the IC determined, on what it recognized to be a question of first impression, that Article 59 requires Urban Commons and Highgate to have the Lender execute an assumption agreement and thereby become a party to the IWA.

Given the unprecedented nature of the IC's decision and the wide-ranging impact it could have on financing of the hospitality industry, the Association requested clarification on whether the IC's decision applies to all lenders. On March 31, 2021, the IC issued a clarification order, providing its decision "does not by itself bind lenders to the IWA absent special facts and circumstances" and "does not mean that all Hotels bound to the IWA that

---

[1] Page numbers refer to PDF pagination, not the internal pagination of the document.
[2] The other provisions of Article 59 are included in an addendum attached to this memorandum.

have a loan or mortgage are now automatically in breach of Article 59 and liable for damages." Grossman Decl., Ex. 2, at 2. But the IC did not identify any facts or circumstances that make the lending agreements here different from any of the hundreds of similar lending agreements covering hotels throughout the city.

On May 4, 2021, the Union sent a letter to Urban Commons and Highgate, stating that it would seek damages under Article 59 unless both parties required the Lender to execute an assumption agreement of the IWA. Grossman Decl., Ex. 3. Urban Commons and Highgate do not have the authority to force the Lender to execute an assumption agreement.

<u>Argument</u>

Urban Commons challenges the Award because the IC exceeded his authority under the IWA and entered an award subject to vacatur under both the Federal Arbitration Act ("FAA") and the Labor Management Relations Act ("LMRA").

**I.    The IC Exceeded His Powers Under the IWA in Violation of the FAA**

Vacatur is required when arbitrators "exceeded their powers" under the arbitration agreement. 9 U.S.C. § 10(a)(4). To determine if an award violates Section 10(a)(4), a court examines "whether the arbitrators had the power, based on…the arbitration agreement, to reach a certain issue…." *Fellus v. Sterne, Agee & Leach, Inc.*, 783 F. Supp. 2d 612, 618 (S.D.N.Y. 2011) (citations omitted). When an award contradicts the plain language of the collective bargaining agreement, the arbitrator goes "beyond the scope of his authority" and the award must be vacated. *See Matter of Arbitration Between Melun Indus., Inc. & Strange*, 898 F. Supp. 990, 992 (S.D.N.Y. 1990).

A.    The IC's decision contradicts the plain language of the IWA. The primary provision relied on by the Union and ruled on by the IC is Article 59(B), which provides that "EMPLOYER shall make it a written material condition of any transaction of any kind whatsoever which transfers majority ownership, management or operational control of the Hotel…must assume and be bound in writing to [the IWA]." Grossman Decl., Ex. 4, at 61.

First, "EMPLOYER" is a defined term that does not include lenders or mortgagees. The IWA defines "EMPLOYER" to include "each and every such hotel, motel, and concessionaire, including their owners, managers, operators, respective affiliated and related entities, successors and assigns." Grossman Decl., Ex. 4, at 15. Because the IWA expressly includes certain entities in the definition of "EMPLOYER," basic rules of contract interpretation required the arbitrator to interpret this definition to exclude other entities not listed in the definition. *See Expressio Unius Est Exclusio Alterius*, Black's Law Dictionary (11th ed. 2019) ("A canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative."). "The ancient maxim *expressio unius est exclusio alterius* (mention of one impliedly excludes others) cautions us against engrafting an additional [item onto the list]." *Greene v. United States*, 79 F.3d 1348, 1355 (2d Cir. 1996); *Mastrocovo v. Capizzi*, 930 N.Y.S.2d 141, 142 (N.Y. App. Div. 2011) ("[T]he expression of one thing implies the exclusion of the other.").

The IC largely ignored the plain language of this definition in the IWA and, instead, in a single, conclusory sentence wrote that "[i]t should be noted that the IWA's definition of 'employer' includes any successor which is extremely broad to include a lender." Grossman Decl., Ex. 1, at 23. But the IC's conclusion does not follow because an entity is not a "successor" in the labor law context unless "the new company has 'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.'" *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987) (citation omitted). An entity is not a successor unless "the business of both employers is essentially the same," "the employees of the new company are doing the same jobs in the same working conditions under the same supervisors," and "the new entity has the same production process, produces the same products, and basically has the same body of customers." *Id.* This description of a "successor" is completely at odds with the position of a lender. And "successor" must be interpreted in light of the term that it ultimately is used to define, "employer." *See*, *e.g.*, *Rapanos v. United States*, 547 U.S. 715, 755 (2006). As should be

needless to say, a lender does not become the "employer" of a business's employees when it makes a loan to that business.

By expanding the definition of "successor" to include a lender, the arbitrator rewrote the contract, and the "arbitrator cannot re-write a new agreement for the parties." *Collins & Aikman Floor Coverings Corp. v. Froehlich*, 736 F. Supp. 480, 484 (S.D.N.Y. 1990). Because the IC effectively inserted language into the contract that was not drafted by the parties, the IC exceeded his powers. An "arbitrator is confined to the interpretation and application of the collective bargaining agreement" and "is without authority to disregard or modify plain and unambiguous provisions." *Am. Fed'n of Television & Radio Artists, AFL-CIO v. Benton & Bowles, Inc.*, 627 F. Supp. 682, 685 (S.D.N.Y. 1986); *see also Katz v. Feinberg*, 167 F. Supp. 2d 556, 572 (S.D.N.Y. 2001), *aff'd*, 290 F.3d 95 (2d Cir. 2002) (holding that an arbitrator "exceeds the scope of its authority when it modifies, rewrites, or holds contrary to clear and unambiguous contractual language" (quotation marks omitted)). In short, the definition of "EMPLOYER" does not include lenders or mortgagees, so any provision in the IWA directed to an "EMPLOYER" does not apply to a lender or mortgagees.

Second, even if the definition of an "EMPLOYER" were ambiguous as to this question, Article 59 still could not apply because it is expressly limited to transactions that cause a transfer of majority ownership, management, or operational control. On this point, the Union emphasized that Article 59(B) applied to "any transaction of any kind whatsoever," but neglected to address the express limitation that immediately follows that language: "which transfers majority ownership, management, or operational control." Grossman Decl., Ex. 1, at 4. Yet the IC summarily concluded that "there exists a 'transaction' that provides for a transfer, albeit a contingent one, that will when final 'transfer majority ownership, management or control' of the property." *Id.* at 24.

Not so. Under New York law, lending agreements do not transfer ownership, management, or control from the mortgagor to the mortgagee. To the contrary, it is well-established that lending agreements only provide the lender with a lien against the property.

"It has often been decided by the courts of this state, and is perfectly well settled, that a mortgage is a lien upon, and not a title in or to [property]—[it] is a mere security for a debt." *King v. Merchants' Exch. Co.*, 5 N.Y. 547, 557 (1851); *see also Bean v. Walker*, 464 N.Y.S.2d 895, 897 (N.Y. App. Div. 1983) ("[I]n New York if an owner purports to convey title to real property as security for a loan[,] the conveyance is deemed to create a lien rather than an outright conveyance."); *Rols Capital Co. v. Panvaspan Realties, Inc.*, 157 Misc. 2d 449, 450 (1993) (recognizing that it is "well-settled law in New York that a mortgage merely creates a lien rather than conveying title"); *Suderov v. Ogle*, 149 Misc. 2d 906, 909 (1991) ("Whenever property is transferred, no matter in what form or by what conveyance, as security for a debt, the conveyance creates a mortgage and the parties are subject only to the obligations of a mortgagor and mortgagee"); *Dream Team Assocs. v. Broadway City*, 2003 WL 21203342, at *2 (N.Y. Civ. Ct. May 7, 2003) ("When a lease is assigned as security for a mortgage, no matter what language is used in the instrument of assignment, no transfer of title to the lease can be effected.").

Lending agreements also do not provide the lender with any control or managerial authority over the property. "A mortgage of real property in the absence of an express agreement conferring the right of possession in the event of default upon the mortgagee originates a contract relationship which continues until final judgment in the foreclosure action…Right of possession is an incident of title which, in the absence of contract, may be divested only under the method prescribed by law. Where sale is made under a judgment, or for unpaid taxes, possession may not be obtained until a…period of redemption has expired." *Holmes v. Gravenhorst*, 188 N.E. 285, 286 (N.Y. Ct. App. 1933); *see also Town of Wellsville v. Shutt*, 303 N.Y.S.2d 121, 124 (Co. Ct. 1969), *aff'd*, 339 N.Y.S.2d 672 (1972) ("The owner of property is under no obligation to involve his mortgagee in temporary possessory or access rights. The mortgagee, indeed, had no right to interfere with the exercise of possession by the mortgagor except by the foreclosure of the mortgage.").

8

The language of the lending agreements confirms that that the Lender did not have any right of control or managerial authority over the Hotel. The Mortgage Agreement expressly provides that "[t]he relationship between Mortgagor and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Mortgagor, and no term or condition of the [Mortgage] Agreement, the Note, this Security Instrument or any other Loan Document shall be construed so as to deem the relationship between Mortgagor and Lender to be other than that of debtor and creditor." Grossman Decl., Ex. 6, at 15. And the SNDA likewise grants a security interest, not a transfer of title. Section 2.1 provides that Owner is granting Lender a "security for the due and punctual payment and performance of the Debt now or thereafter due from Borrower to Lender under the Loan Documents," and Section 2.5 provides that the Lender does not have "any of Owner's obligations under the [Operating] Agreement unless and until Lender shall have assumed the [Operating] Agreement in accordance with the provisions of this Subordination." Grossman Decl., Ex. 7, at 7–8.

The IC found that transfer of majority ownership, management, or control depended on a contingent event. And the series of contingent events that would trigger application of Article 59(B) are default on the loan, foreclosure, and expiration of the redemption period. Because none of these contingent events have occurred—and no one contends that it is likely that they will—there has not been "any transaction of any kind whatsoever which transfers majority ownership, management or operational control of the Hotel or Concessionaire such that the party ('transferee') assuming such majority ownership, management or operational control must assume and be bound in writing to this Agreement." Grossman Decl., Ex. 4, at 61. By its own terms, Article 59(B) does not apply to lending agreements and Urban Commons and Highgate did not violate the IWA by not having the Lender execute an assumption agreement of the IWA.

To that end, the form "Assumption Agreement" set forth in the IWA also confirms that Article 59 does not apply to lenders. *See* Addendum 1-2. None of the terms describe a

9

lender, much less use the words "lender" or "mortgagee." To the contrary, the model agreement is framed in terms of "purchasers," "sellers," and "managers." Other phrases also only make sense in the context of a purchase agreement, not standard mortgage agreements: phrases like, "[p]urchaser has agreed to purchase," "effective as of the date of closing," and "[b]y virtue of closing" have no place in agreements defining loan terms. In contrast, when read, as it has been read since it was executed, the model agreement makes complete sense—it identifies obligations under the IWA of an owner or operator upon purchasing the hotel.

B.    The IC's decision is also contrary to the overall structure of the IWA and the history of its implementation. To begin with, mortgage lenders share none of the attributes of an "EMPLOYER" subject to the IWA. A mere lender exercises no operational authority or control of the hotel, does not employ or direct hotel employees, and has no ability to carry out the IWA's various obligations on an "EMPLOYER" involving such matters as collecting dues on behalf of the Union, setting working hours, observing seniority rights, providing employee-related information to the Union, observing the job duties specified by the IWA, providing adequate supplies or equipment to employees, etc., etc., ad infinitum. A mere lender does not "fit" what the IWA contemplates an "EMPLOYER" will be and do. Confirming as much, the words "lender" and "mortgagee" appear nowhere in the 155-pages of the IWA and addendums. If Article 59 were intended to cover lending agreements, then surely the IWA would have said so.[3] *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 458 (S.D.N.Y. 2010) (holding that the "text fails to show an intent to co[ver]" a certain subject because of the "silence on this point"); *Beardsley v. McCutcheon*, 49 N.Y.S. 535, 537 (N.Y. App. Div. 1898) (holding that a contract "is concededly silent upon that subject; and, as the parties appear to have executed it with due formality and deliberation, they should now abide the consequences of their omission."). Further confirming the point, never once before this case

---

[3] Even Article 65 which sets forth employers' obligations in case of a bankruptcy does not speak to lenders having to assume the IWA because their borrower is a signatory to the contract.

has a mere lender been roped into the IWA as an "EMPLOYER." Hotel mortgages are nothing new, nor is Article 59. Yet the Union was unable to identify a single instance in which the IWA regarded a mere lender as an "Employer," let alone any instance where anyone so much as contemplated that Article 59 required mere lenders to assume the IWA and its myriad obligations. Indeed, the IC recognized that this was a "first time issue." Grossman Decl., Ex. 1, at 23. That's because the Union's position, as adopted by the IC, contradicts decades of industry practice and settled expectations.

Of course, the obvious reason that the IWA does not mention or even contemplate the binding of "lenders" or "mortgagees" is that Article 59 does not apply to lenders or mortgagees with nothing more than a security interest in a hotel. Arbitration "is a matter of consent, not of coercion," *Keymer v. Management Recruiters International, Inc.*, 169 F.3d 501, 504 (8th Cir. 1999), and Urban Commons never consented to granting the IC sweeping power to "undertak[e] a fundamental revision" of the IWA, *Melun Industries*, 898 F. Supp. at 994. Because the Award went "beyond th[e] self-limiting agreement between consenting parties," the IC "act[ed] inherently without power," and therefore the award "must be vacated." *Porzig v. Dresdner, Kleinwort, Benson, N.A.*, 497 F.3d 133, 140 (2d Cir. 2007).

## II.    The Arbitrator Did Not Draw His Award from the "Essence" of the IWA and Therefore the Award Violates the LMRA

Because this Award is a labor arbitration award, it is subject to review under Section 301(a) of the Labor Management Relations Act. 29 U.S.C. § 185(a). The Supreme Court has long required that "an arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

Here, for the reasons described above, rough "industrial justice" is the only possible interpretation of the IC's award. Rather than interpret and apply the IWA, the Award "completely ignored," *Local 814, Intern. Broth. Of Teamsters, Chauffeurs, Warehousemen, and*

*Helpers of America v. Sotherby's Inc.*, 665 F. Supp. 1089, 1093 (S.D.N.Y. 1987), the IWA's terms to reach a result that the IC regarded as fair, notwithstanding that this result actually conflicts with the IWA's provision addressing successors and assigns. As described above, the definition of "EMPLOYER" does not include a lender and Article 59 does not apply by its plain terms to transactions such as lending agreements. The resulting Award therefore does not draw its essence from the IWA, and so must be vacated.

### III.   The Arbitrator's Award Is Commercially Unreasonable and Upsets Settled Expectations

The arbitrator's award also has massive financial ramifications for the hospitality industry, which is already cratering in the shock waves of the COVID-19 pandemic. *See* Mary K. Jacob, *NYC faces crisis of empty hotels amid COVID pandemic*, N.Y. Post (Mar. 9, 2021) ("Recently, seven hotels have been forced to go into foreclosure and were placed up for auction.")[4]; *New York Hotels Facing Foreclosures as Business Still In Doldrums*, Industry Leaders Magazine (hereinafter "*Hotels Facing Foreclosure*").[5] "It is black-letter law that courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical." *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015); *see also Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (holding that contracts "should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes."). A "contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Greenwich Cap. Fin. Prod., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010).

First, the IC's decision upsets settled expectations based on decades or more of commercial practice. "It is well-settled that when interpreting a contract, the court should

---

[4] *Available at* https://nypost.com/2021/03/09/nyc-faces-crisis-of-empty-hotels-amid-covid-19-pandemic/.

[5] *Available at* https://www.industryleadersmagazine.com/new-york-hotels-facing-foreclosures-as-business-still-in-doldrums/.

arrive at a construction which will give fair meaning to all of the language employed by the parties, to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized." *Yonkers Contracting Co. v. Romano Enterprises of New York, Inc.*, 835 N.Y.S.2d 363, 364 (N.Y. App. Div. 2007) (citation and quotation marks omitted); *see also Joseph v. Creek & Pines, Ltd.*, 629 N.Y.S.2d 75, 76 (N.Y. App. Div. 1995) (same). The parties' reasonable expectations are informed by standard practices in the industry. *See United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82 (1960) ("The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it.").

As Urban Commons wrote to the IC, "The Union did not introduce a single example of Article 59 being applied to transactions akin to the Lending Transactions." Grossman Decl., Ex. 1, at 16. The IC did not highlight or dispute this factual contention, despite writing that if a "factual recitation is without support or irrelevant, it will be highlighted in the Analysis section of this award." *Id.* at 3. To the contrary, the IC acknowledged that the Union's interpretation of Article 59 presented a "first time issue." Thus, it is undisputed that the industry has not previously interpreted Article 59 to apply to lending terms. The reasonable expectation of Urban Commons and Highgate (and the Lender) was that the IWA would be understood and interpreted as it had been since it was signed in 2012 and in previous iterations of the IWA.

What's worse, hotels under existing loans have no authority to force lenders to join the IWA, and so would be (under the IC's decision) subject to *monetary penalties* despite that the hotels lack the power to cure this situation. The inevitable result is that hotels must either suffer a penalty at the whim of the Impartial Chairman, pay the Union not to file a grievance because the lender has not joined the IWA, or agree to adverse lending terms as the *quid pro quo* to having the lender join the IWA. Regardless, in the end, the hotels are left footing a bill that was never contemplated when the IWA was drafted. By interpreting Article 59 to require

13

lenders to join the IWA, the IC upset long-settled expectations and, accordingly, the award should be vacated.

Second, the IC's decision is commercially unreasonable. Because lenders have no interest in assuming employment obligations under a collective bargaining agreement, the IC's decision will deter lenders from providing loans to hotels, quite likely stall hotel development and force more hotels into foreclosure, and ultimately result in more lost jobs in the hospitality industry. "Most hotels in New York City rely on traditional financing, including a combination of investor (both institutional and individual) and developer-contributed equity and debt underwritten by investment banks, capital management firms and traditional lenders." *NYC Hotel Market Analysis: Existing Conditions and 15-Year Outlook*, N.Y.C. Dep't City Planning (2020). Because of lenders' reluctance to be exposed to liability from assuming the IWA, the cost for loans will be higher. And these are costs that the industry cannot sustain following the economic devastation of the industry from COVID-19.

Even without the IC's decision restricting access to loans, the hotel industry in New York is in dire circumstances. In the wake of the shutdowns from the COVID-19 pandemic, "New York City's skyscrapers, hotels, apartment buildings and stores" were emptied for months and the once vibrant city became a "ghost town." *See* David J. Lynch, *Mounting commercial real estate losses threaten banks, recovery*, The Washington Post (Nov. 11, 2020).[6] In particular, "New York City had a total of 705 hotels with a total of 127,810 rooms in January 2020. By September 2020, 20 percent of the hotels and 31 percent of the rooms were shut down. Of the rooms that were closed, 9 percent were closed permanently" and the hotel industry "is not expected to fully recover to pre-pandemic levels until 2025." *The Tourism Industry in New York City: Reigniting the Return*, Office of the New York State Comptroller (April 2021) (hereinafter "*Tourism Industry in New York City*"). Because of the lost revenue from tourism as a whole, the City estimates around "$1.2 billion in lost tax revenues." *Id.*

---

[6] *Available at* https://www.washingtonpost.com/business/2020/11/11/commercial-real-estate-economy/.

The IC's decision will have the exact opposite result of job preservation for Union employees, which as the Union contends is "Article 59's fundamental purpose." Grossman Decl., Ex. 1, at 7. Pre-pandemic, the "hotel and accommodations sector provided 52,000 jobs and $3.6 billion in wages." *Supra*, *Tourism Industry in New York City*. After a 67 percent decline in visitors to New York City in 2020 and massive loss of revenue for hotels, there has already been a 44 percent loss of jobs (or 23,813) in the hotel industry. But that is not the worst, because "New York hotels are facing an immediate crisis with a wave of foreclosures due to COVID-19" and some estimate that "[f]our out of five properties with commercial mortgage bonds are under threat of being unable to meet their loan obligations." *Supra*, *Hotels Facing Foreclosure*. Burdening hotels with more loan-related expenses while the industry is already cratering under financial pressure is commercially unreasonable and will ultimately cause a loss of the very jobs that the Union purports to be preserving through its strained reading of Article 59 of the IWA.

## Conclusion

Petitioner respectfully requests that the Court vacate the Award.

Dated: June 1, 2021                    Respectfully Submitted,

                                       /s/ Paul Rosenberg
                                       PAUL ROSENBERG
                                       BAKER & HOSTETLER LLP
                                       45 Rockefeller Plaza
                                       New York, N.Y. 10111
                                       (212) 589-4299 (phone)
                                       (212) 589-4201 (fax)
                                       prosenberg@bakerlaw.com

                                       ANDREW M. GROSSMAN*
                                       RENEE M. KNUDSEN*
                                       BAKER & HOSTETLER LLP
                                       1050 Connecticut Ave., N.W.
                                       Washington, D.C. 20036
                                       (202) 861-1697 (phone)
                                       (202) 861-1783 (fax)
                                       agrossman@bakerlaw.com
                                       rknudsen@bakerlaw.com

                                       *Attorneys for Petitioner*

*Pro hac vice* applications forthcoming.

16

**<u>Addendum</u>**

**Industry Wide Collective Bargaining Agreement, Article 59**

A. This Agreement shall be binding upon the successors and assigns of the parties hereto, and no provisions, terms, or obligations herein contained shall be affected, modified, altered, or changed in any respect whatsoever by the consolidation, merger, sale, transfer, or assignment of either party hereto or affected, modified, altered or changed in any respect whatsoever by any change of any kind in the legal status, ownership, or management of either party hereto. Any successor EMPLOYER shall assume all of the obligations under this Agreement of the prior operator of the hotel or concession to the employees, the UNION or any of the funds to which EMPLOYERS are required to contribute hereunder.

B. EMPLOYER shall make it a written material condition of any transaction of any kind whatsoever which transfers majority ownership, management or operational control of the Hotel or Concessionaire such that the party ("transferee") assuming such majority ownership, management or operational control must assume and be bound in writing to this Agreement.

C. A successor, assign or transferee shall assume all obligations of the predecessor, assignor or transferor, including this Agreement and those agreement and practices supplementing this Agreement. Subject to Paragraph (D), every successor assign and transferee shall execute an assumption agreement substantially similar to the following not less than ten (10) business days prior to any transfer or change covered by this Article.

**ASSUMPTION AGREEMENT**

**Agreement made as of this ___ day of ___ 20__, by and between [PURCHASER NAME] and [MANAGER/OPERATER NAME, IF DIFFERENT] by its managing agent, on their own behalf and on behalf of any affiliated or related entity and any current or future owner, manager or operator, and their respective successors or assigns (collectively, "Purchaser"), and the New York Hotel and Motel Trades Council, AFL-CIO ("Union").**

**Whereas, Purchaser has agreed to purchase the [HOTEL NAME] ("Hotel") from the current owner, [SELLER NAME] ("Seller");**

**Whereas, the Seller is bound to, inter alia, Article 59 of a collective bargaining agreement known as the Industry Wide Agreement between the Union and the Hotel Association of New York City, Inc. known as the Industry Wide Collective Bargaining Agreement ("IWA");**

**Whereas, Article 59 of the IWA requires successors, assigns and transferees ("successor") to be bound to the IWA;**

**Where, the Purchaser agrees that it is a successor to the obligations under the IWA;**

**Now, therefore it is agreed:**

1. **Purchaser agrees that it shall retain all current bargaining unit employees whose employment will continue uninterrupted and without loss of seniority,**

Addendum 1

compensation, benefits or fringe benefits, and with no adverse effect on other terms and conditions of employment, subject to the IWA and applicable law.

2. Purchaser agrees that, effective as of the date of the closing, it has assumed, adopted and is bound by all of the terms, both economic and non-economic, of the IWA and those agreements and practices supplementing the IWA.

3. By virtue of the closing, Purchaser acknowledges that no new verification of currently valid I-9 forms will be necessary.

4. Effective immediately any and all disputes between the parties or regarding the interpretation or application of this Agreement shall be subject to the grievance and arbitration provisions of the IWA, the entirety of which is incorporated herein by reference.

| FOR THE UNION | FOR THE PURCHASER (on behalf of each owner, operator and manager) |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Authorized to Sign | Authorized to Sign |
| Dated: _____ | Dated: _____ |

D. In the event an Owner of a Hotel is not the EMPLOYER of the Hotel's employee nor otherwise bound by the IWA, the Owner shall be (i) bound by the Successor and Assigns, Accretion, and Neutrality and Card Check provisions of IWA (ii) shall be secondarily liable for any obligations of any EMPLOYER in the Hotel under the IWA, and (iii) shall be bound by the arbitration provisions of the IWA as they relate to any dispute regarding these provisions. Such Owner shall be required to sign an agreement with the Union reaffirming such, including the obligation to retain all bargaining unit employees, whose employment will continue uninterrupted without loss of seniority, compensation, benefits, or other terms and conditions of employment subject to the IWA and applicable law.

E. Not less than thirty (30) days prior to the closing of the transaction, the EMPLOYER shall give the UNION notice in writing of the possibility of a transaction between the EMPLOYER and the potential transferee and the notice to the UNION will provide the details then known to the EMPLOYER as to the nature, expected closing date, and identity of the parties to the transaction. Not less than ten (10) business days prior to the closing of the transaction, the EMPLOYER shall give the UNION notice in writing of the transaction between the EMPLOYER and the transferee and the notice to the UNION will provide the full and

Addendum 2

complete identity of the transferee, together with a duly executed copy of the pertinent portion of the transaction agreement between the EMPLOYER and the transferee pursuant to which the transferee agrees to assume this Agreement.

F. Said notices will be held by the UNION in strict confidence and the UNION, upon request of the EMPLOYER, will agree to a confidentiality pledge upon terms mutually acceptable to the EMPLOYER and the UNION, provided, however, that such confidentiality pledge will be ineffective upon the EMPLOYER'S violation of this Article 59. If the UNION is provided with a signed copy of the portion of the agreement where the transferee agrees to assume this Agreement, the UNION will not contact the transferee prior to the closer.

G. The EMPLOYER and UNION agree that if a determination is made by the Impartial Chairperson that a violation of Article 59 has occurred, then in such case, the violation will be deemed to be irreparably harmful to the UNION and its members. In such event, the UNION may seek such relief as is necessary to redress and remedy such violation and irreparable harm, including, but not limited to, the award of monetary damages and/or injunctive relief either from the Office of the Impartial Chairperson, the National Labor Relations Board, a court of competent jurisdiction or such other forum as deemed appropriate by the UNION.

Addendum 3